484 So.2d 329 (1985)
NATIONAL LIFE AND ACCIDENT INSURANCE COMPANY
v.
Carolyn MILLER and Marvin Ramsey Miller, Sr.
No. 54702.
Supreme Court of Mississippi.
November 13, 1985.
Rehearing Denied December 4, 1985.
*330 S. Wayne Easterling, Easterling & Varnado, Hattiesburg, for appellant.
Michael B. McMahan, McMahan & McMahan, Hattiesburg, for appellees.
Before PATTERSON, C.J., and DAN M. LEE and SULLIVAN, JJ.
DAN M. LEE, Justice, for the Court:
This appeal comes to us from the Circuit Court of Forrest County wherein Carolyn Miller and Marvin Ramsey Miller, Sr., the appellees, received a judgment against the appellant, National Life and Accident Insurance Company, in the amount of $352,500. The Millers had filed suit against National claiming that National had failed to pay on a life insurance policy the Millers had purchased covering their son, Marvin Ramsey Miller, Jr. In addition to the policy limits, the Millers also sought punitive damages for what they alleged to be National's bad faith refusal to make payment due under the policy. Following the trial and the rendition of the aforementioned judgment against it, National now brings this appeal. We have carefully studied the record and briefs of counsel in this cause and found no reversible error. We therefore affirm.

THE FACTS
The first witness produced at trial was Lavern Dillon, an agent for National, who was called adversely by the Millers. Dillon had worked for National since August, 1980. He testified that he had received information that the Millers desired to purchase some insurance so he and his staff manager, Joe Blount, called on them. Mr. Miller was not at home so Blount and Dillon discussed insurance with Mrs. Miller. She agreed to purchase a life insurance policy from National covering her and her husband for $5,000 and their child for $2,500.
In filling out the application, Blount held it in his hand and read the questions to Mrs. Miller. The only thing Mrs. Miller did was to sign the application. This was on April 9, 1981. Because Mr. Miller had not been at home, Blount and Dillon left the application with Mrs. Miller and Blount returned the next day to pick it up after Mr. Miller had signed it.
Dillon testified that in filling out the application for insurance, question 26(b) asks: "Has any proposed insured (or provider) ever consulted with or been treated by a doctor for, or been told by a doctor he had disease of the heart, blood, lungs, kidneys, digestive system or brain or nervous system?" Dillon stated that Mrs. Miller told them that her child had a heart murmur. Instead of recording Mrs. Miller's response, Blount answered the questions by marking a box labeled "No." Question 24 asked "Has any proposed insured (or provider) within the past five years consulted with or been treated by a doctor, or been confined to any hospital?" Again, Blount marked the "No" box; however, Dillon testified that Mrs. Miller told them *331 that the child had been treated by a doctor for the heart murmur and had been in the hospital within the last five (5) years.
Dillon testified that he knew that it was important to furnish the correct information on the application. He stated that he did not consider a heart murmur significant and thought that it was only an irregular beat. At that time, he saw no harm in omitting the information from the application. He testified that he knew that he and Blount had not accurately recorded Mrs. Miller's responses.
The child died during open heart surgery on July 22, 1981. Approximately one and one-half to two months after that, Dillon called on the Millers to collect the premium. At that time the Millers told him of their son's death. Dillon assisted them in filling out the appropriate papers to make a claim on the policy. On October 5, 1981, Dillon received a letter from Blount's superior, Martin Brashier, National's District Manager. Brashier was simply forwarding the letter from the Company's home office in Nashville, Tennessee. That letter inquired whether all of the questions on the application had been asked and answered as recorded. Dillon replied that they had been. The letter also asked who was present at the time of the taking of the application. Dillon replied that only he and Mrs. Miller were present. Finally, the letter asked if Dillon had any knowledge of the child's heart condition. Dillon responded that he did not. Dillon gave the letter and his responses to Blount who forwarded them to the home office.
A second letter from the home office to Dillon on November 16, 1981, requested further information. That letter inquired of Dillon whether the Millers had discussed their problems with him. Dillon replied that they had not. The letter also asked if he had any idea why the Millers thought that he was aware of their child's heart condition. Dillon replied that he had no idea. This letter and Dillon's responses were also forwarded to the home office through Blount.
In December, 1981, National decided not to pay the claim because its investigation revealed that the child had been born with a congenital heart defect and had been hospitalized many times for treatment of that condition. National's position was that the Millers had made false statements on the application for insurance. Dillon testified that he and Blount had discussed four or five times the fact that Mrs. Miller had mentioned the heart murmur to them. He had also discussed it with Brashier three or four times. Nonetheless, Dillon never attempted to notify anyone else in the company that the responses recorded on the application were not the responses Mrs. Miller gave them.
At trial, the Millers introduced a transcript of a tape recorded conversation between Mrs. Miller and Dillon. The call was placed from the Millers' attorney's office and Dillon was unaware that it was being recorded. In that conversation, Mrs. Miller sought information about why it was taking so long to process her claim. Several times in the conversation Dillon told her to "Just say it like you said, say that you told me about it..." Dillon stated "Right, yes, mam, I remember you telling me. I mean if I say I did not know it, then they could, could still go ahead and deny the claim." Dillon went on to say, "Just tell them the truth, that you told me about it, everything about it. That's all I need you to do." Mrs. Miller then asked, "Okay, and you say you are going to tell them what?" To which Dillon replied, "That I didn't know about it." Mrs. Miller then asked, "Oh! and this is supposed to help me, right?" To which Dillon stated, "Right, yes, mam its supposed to help you out."
Following the introduction of the transcript of the tape recorded conversation, Dillon testified that he now denies that Mrs. Miller had told him about the child having been treated in the hospital within the last five years. He stated that his admonition to her to tell "Everything" referred only to what he thought was an insignificant heart murmur.
*332 Dillon was recalled to the stand as a defense witness. At that time he testified that his salary was based on a commission from his sales. He then again denied that Mrs. Miller had told him about the child having been in the hospital. He also denied that she had mentioned that the child had had surgery. He stated that in his responses to the company inquiries about his knowledge, he "didn't put a lot of thought into them."
On cross-examination Dillon stated that National had no claims department in Mississippi. They got all of their claims information from their soliciting agents. Part of his duties included helping to adjust claims. He admitted that when he testified as an adverse witness he had stated that Mrs. Miller had told him about the heart murmur. He also admitted that when testifying at that time he stated that Mrs. Miller had told him about the child's doctors treatments and hospitalizations. He then denied that those responses were true.
Dillon testified that he knew Mrs. Miller relied on him to help settle her claim. He also stated that he, Blount and Brashier all knew that his responses to the company's inquiries concerning his knowledge misrepresented the truth.
Carolyn Miller testified after Dillon. She is a dietary aide who has never finished high school. The child in question had been born with a heart defect that the physicians described to her only as a "murmur." They never referred to the child's condition by any other name to her. Through the six (6) years of the child's life he was never released from a doctor's care. He had had a heart catherization when first born and many subsequent hospitalizations.
Mrs. Miller testified that she and her husband decided that they needed some insurance so she asked at work if anyone there could advise her on an insurance company. A friend recommended National Life. Her friend asked Dillon to call on Mrs. Miller. As a result, Dillon and Blount came to Mrs. Miller's home. Mrs. Miller testified that she answered all of the questions on the application honestly. She told Blount and Dillon about the heart murmur and the child's having been under a doctor's care. She also told about the hospitalization and the surgery he had had. Mrs. Miller stated that Blount held the application, read the questions and filled in the responses.
When Dillon came by the Miller home to pick up the insurance premium, after the child died, Mrs. Miller informed him of the death. Mrs. Miller testified that Dillon helped her fill out some papers and then after that he appeared to be avoiding her.
On cross-examination, Mrs. Miller testified that she knew that her son's heart condition was serious. She admitted signing the application and stated that she now knows that the application contains incorrect information. She testified that she did not know the application had been filled out wrong until sometime in November or December when the insurance company refused to pay on the policy. She stated that she had never read over the application and had surrendered it and the policy to Dillon when she first told him of her son's death. She testified that she was led to believe that Dillon was taking care of everything for her and that she did not know anyone else in the insurance company to contact.
Marvin Miller, Sr. testified that he was twenty-seven (27) years old, and had only been through the ninth grade. He could read and write only poorly. Miller testified that he was not present when Dillon and Blount came to his home. His wife gave him the application to sign the next morning and he did so without reading it. Following Mr. Miller's testimony, the Millers rested their case.
Dillon had been named as a defendant; however, after the Millers rested the trial court granted a directed verdict for Dillon. A motion to dismiss as to Carolyn Miller because Marvin Miller was the policyholder was overruled.
Following Lavern Dillon's further examination, Joe Blount was called to the stand. He testified that he was Dillon's superior. He stated that he and Dillon had authority *333 only as soliciting agents and had no authority to bind a contract. Blount stated that he asked the questions on the application to Mrs. Miller and filled out the responses. He denied that Mrs. Miller had told them about the child having been in the hospital.
After a claim had been made on the policy, Blount received an inquiry from Brashier and forwarded it to Dillon. He admitted that he reviewed Dillon's responses. He did the same with the second inquiry.
Blount testified that he had had a heart murmur at birth and that he considered the situation insignificant. He particularly thought it insignificant because he stated that Mrs. Miller did not tell them about any further medical treatment in relation to it.
Blount admitted that he never made a statement to the company's home office that he was aware of the heart murmur. He also never informed the home office that he had been present at the time of the taking of the application. He was aware of the misrepresentations made by Dillon in Dillon's responses to the company's inquiries. Blount also knew that had he recorded the heart murmur on the policy it was likely that the company would have investigated the child's hospital and medical records and determined not to insure the child. Blount testified that he had discussed the situation with Brashier three to four times. He did not discuss the situation with National's attorneys until two weeks before trial because those attorneys had not made any inquiry of him prior to that period.
Although Blount had testified that he was only a soliciting agent, he stated that he did help to handle claims and assist in their processing. He stated that Brashier and Dillon did likewise.
Martin Brashier, the District Manager for National, testified that he did not discuss the heart murmur with either Dillon or Blount. Later, in an ambiguous response, Brashier stated that although he didn't go over the facts of the situation with Dillon, he did talk with him about it. Brashier stated that he was aware that at the very least Mrs. Miller had told Blount and Dillon that the doctors had discovered a "noise" in the child's chest at birth. He testified that he never relayed this information to the claims department. Although he assisted in providing claims information he never told the claims department about the murmur after he learned of it.
Benton Shoemake, National's second Vice-President in charge of underwriting, testified that had the company known the truth the child would have been denied coverage. He admitted that had he denied coverage to the child, the Millers would have sought all of their insurance from another company. Shoemake testified that the company only learned two weeks before trial that its agents knew of the heart murmur. In Shoemake's opinion the policy had been mishandled from the date of the application.
Following Shoemake's testimony the defense rested and the jury was provided information on National's annual wealth. Thereafter, upon being instructed as to the law, the jury returned a verdict for the Millers in the amount of $2,500 actual damages and $350,000 punitive damages.

DID THE TRIAL COURT ERR IN SUBMITTING THE ISSUE OF PUNITIVE DAMAGES TO THE JURY?
We begin this discussion by addressing National's assertion that the Millers knew that their application for insurance contained false information and as a result the insurance company had a judicial reason and therefore an arguable basis for denying the claim. Both agents Dillon and Blount testified that Mrs. Miller told them that her child had suffered a heart murmur. Although Blount denied that they were told the child had been hospitalized, Dillon stated that they were given that information. Later in the course of the trial Dillon retracted his statement and denied that they had been told that the child had been hospitalized. Regardless, both agents admitted knowing of the heart murmur. They failed to note that on the application *334 or explain it in the space provided on the application. Both Dillon and Blount were aware that they had been responsible for filling out the application and that Mrs. Miller was relying on them to record her responses. Whether Mrs. Miller disclosed her child's hospitalization may have been a question of fact; however, there was no issue of fact as to whether she disclosed the heart murmur. Both Dillon and Blount testified that she had informed them of the murmur. In World Insurance Co. v. Bethea, 230 Miss. 765, 93 So.2d 624 (1957), this Court quoted from an earlier decision, Planters Insurance Co. v. Myers, 55 Miss. 479 (1877):
We adopt the doctrine of those cases which hold that, if the agent takes charge of the preparation of the application, or suggests or advises what shall be answered, or what shall be a sufficient answer, the company shall not avoid the policy because they are false or untrue, if full disclosures were made by the applicant to him.
Not only did Blount and Dillon take charge of the preparation of the application, but, they made the decision, independent of Mrs. Miller, not to record the information about the heart murmur. Under the law of this state National cannot avoid the policy because the application for insurance did not fully disclose information given to its agents. The failure of the application to contain all of the information relayed by Mrs. Miller to Dillon and Blount does not constitute an arguable basis for denying the claim. See, Bankers Life Insurance v. Crenshaw, 483 So.2d 254 (1985).
National next asserts that the knowledge gained by Dillon and Blount while taking the application from Mrs. Miller cannot be imputed to it because they were merely soliciting agents. That position is contrary to the law of this state as defined both by statute and case law. Miss. Code Ann. § 83-17-1 (1972) reads as follows:
Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, collect, or transmit any premium of insurance, or make or forward a diagram of any building, or do or perform any other act or thing in the making or consummation of any contract of insurance for or with any such insurance company, other than for himself, or who shall examine into or adjust or aid in adjusting any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request or by the employment of the insurance company, or of or by any broker or other person, shall be held to be the agent of the company for which the act is done or the risk is taken as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract. Such person knowingly procuring, by fraudulent representations, payment or the obligation for the payment of a premium of insurance shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, or be imprisoned for not more than one year.
Decisions of this Court interpreting § 83-17-1 are far too numerous to attempt to enumerate them all. Some examples follow. In Hartford Fire Insurance Co. v. Clark, 154 Miss. 418, 122 So. 551 (1929), this Court held:
Appellant does not seriously contend that the testimony is not sufficient to support the finding of fact that the agent Dicken had knowledge of the condition of the title or quality of ownership of the insured when he accepted and forwarded the application and when he countersigned and delivered the policy and collected the premium. Nor does appellant directly attempt to controvert the proposition of law that "an insurance company, like other principals, is bound by knowledge of, or notice to, its agents *335 within the general scope of his authority, notwithstanding a contrary provision in the application or policy." 32 C.J. 1069. This proposition of law has become too firmly fixed in our jurisprudence to be now questioned. For instance, on this point it was said in Rivara v. Ins. Co., 62 Miss. [720] at page 729: "In such case the insurance company cannot claim that it has been wronged or deceived, and to permit it to issue a policy and take the benefits of the contract, knowing at the time that it is not bound thereby, and afterwards to avoid liability thereon, upon the ground that something existed or did not exist of which the company or its agent was fully aware at the time the contract was made, would be repugnant to that sense of justice and morality which is and should be inculcated by law." See, also, Ins. Co. v. Randle, 81 Miss. 720, 33 So. 500; Ins. Co. v. Gibson, 72 Miss. 58, 17 So. 13.
But it is the contention of appellant that the agent Dicken was a mere soliciting agent, that he had no authority to issue a farm policy such as this, and that the facts were such as to put the insured on notice of this limited authority. Putting aside the fact that this policy under its express terms had no validity until countersigned by S.H. Dicken & Son, and that their signature was not the intermediate but the final act of execution which put the policy into existence, and conceding for the purposes of this case that Dicken was a soliciting agent only, we think the weight of modern judicial opinion throughout the country supports the proposition that "knowledge acquired by a soliciting agent in the course of his employment in soliciting insurance, preparing and transmitting applications, delivering policies, etc., is ordinarily imputed to the company," 32 C.J. 1325; 26 C.J. 296-298, and, were the question a new one in this case and in this state, we would so hold, not only upon principles of the common law, but upon what we deem to be the clear provisions of our statute, section 2615, Code 1906 (section 5873 Hemingway's 1927 Code). But the question is not new in this state; it was expressly decided in Big Creek Drug Co. v. Ins. Co., 115 Miss. 333, 75 So. 768, in which the court said: "It makes no difference whether Dezonia was a soliciting agent or a general agent of his company. The testimony undisputably shows that he was the only agent who solicited the insurance, inspected the risk, accepted the application, receipted for the premium, and delivered the policy... . In this case the knowledge of Dezonia was the knowledge of the company; and a policy delivered with full knowledge of a state of facts which under its written stipulations, would render the insurance void should be binding upon the company."
We not only approve the holding in the cited case, but we approve and adopt the terse expression taken from the opinion in Bergeron v. Ins. Co., 111 N.C. [45] at page 47, 15 S.E. 883, wherein the whole matter is cast into one sentence as follows: "The principle has been more than once announced by this court, that where a soliciting agent is informed, before the policy is issued, of a fact, which, if fraudulently concealed by the applicant, would constitute a ground of forfeiture under one of its conditions, and afterwards receives the premium and delivers the policy, his knowledge is imputed to his principal, and, whether he actually communicates the fact to the principal office of the company or not, the condition is deemed to have been waived." (Emphasis supplied)
154 Miss. at 427-429, 122 So. at 554.
In Life Insurance Co. v. Cassity, 173 Miss. 840, 163 So. 508 (1935), the Court briefly set forth the facts and rules of law as follows:
We are of the opinion that the case at bar is not controlled by said cases, and others of similar import. The proof of both the appellant and the appellee showed that the cashier of the Jackson office had authority to transmit applications for benefits under policies issued by the company in this state to the home *336 office. It is true that the cashier did not pass upon the sufficiency of the proof to establish liability, but he was authorized to assist policyholders in preparing applications. It was his duty to transmit them to the home office, and to advise policyholders as to what their rights were under the policies, and what proof was necessary for them to furnish to the company in order to sustain their claims; and, as stated by the company's former agent, frequently claims were adjusted and disabilities paid, although in the opinion of the agent of the company they were not strictly bound thereby. In other words, the cashier of the local office was an agent for the company for receiving applications to be transmitted to the home office. That being true, the cashier of the Jackson office was the agent of the company or its alter ego, under section 5196, Code 1930, and the cases there cited and Aetna Ins. Company v. Lester, 170 Miss. 353, 154 So. 706.
175 Miss. at 851, 163 So. at 511.
See also World Insurance Co. v. Bethea, supra, and Big Creek Drug Co. v. Insurance Co., 115 Miss. 333, 75 So. 768 (1917).
Next, National argues that the knowledge of Dillon was not imputable to it because following the tape recorded conversation between Mrs. Miller and Dillon, the Millers had knowledge that Dillon was not being honest with National and therefore the inference that his knowledge was imputable to National was not applicable. At first blush, this argument sounds persuasive; however, upon examination its logic loses its luster. First, although Dillon told Mrs. Miller that he was going to misrepresent his knowledge to the insurance company, Mrs. Miller had no way of knowing that he would actually do so. Secondly, and more importantly, the Millers had absolutely no reason to believe that Blount or Brashier would join in this conspiracy of silence by failing to disclose and, at times, misrepresent the extent of their knowledge. Certainly the knowledge of Blount and Brashier was attributable to National. Both men were aware that Dillon had not been honest with the company. Both men, after having discussed repeatedly the fact that Mrs. Miller did inform them of the child's heart murmur, made the conscious decision not to disclose the truth. Blount and Brashier were supervisors and held executive positions with National. They not only had the authority, but the affirmative duty of transmitting the extent of their knowledge to National's claims office. Their failure to do so is completely unexplained by the record except by the inference that they were willfully covering up Blount's negligence in filling out the insurance application.
Of course, bad faith on the part of an insurance company must be in the form of some act or failure to act on the part of an individual or individuals acting for the company. Where these agents failed to correctly record Mrs. Miller's responses on the application and then further failed to bring that error to the attention of the claims department, and in fact, misrepresented the extent of their knowledge, it cannot be said that a jury would not be justified in finding that those agent's actions amounted to willfulness or such gross negligence as to amount to a reckless disregard of the Millers' rights. In that situation, the issue of punitive damages is properly submitted to the jury. Bankers Life & Casualty Co. v. Crenshaw, supra; Commodore Corp. v. Bailey, 393 So.2d 467 (Miss. 1981).
In Napp v. Liberty National Life Ins. Co., 248 Miss. 320, 159 So.2d 164 (1963), this Court held that it is well settled that the principal is liable for the frauds and misrepresentations of his agent acting within the scope of the authority or employment of the agent, even though he had no knowledge thereof and received no benefits therefrom. In this case, the knowledge of Blount and Brashier was attributable to National. That knowledge was not only that Mrs. Miller had revealed her son's heart murmur, but also that Agent Dillon was misrepresenting the extent of his knowledge. Instead of coming forward with what they knew to be the truth, *337 Blount and Brashier also chose to conceal the truth.
Finally, we look at the extent of investigation into the claim made by National prior to its rejection. National's claims office and its attorneys never interviewed Blount or Dillon until only two weeks prior to trial, some eleven months after rejecting the claim. Those attorneys never made discovery requests which would have revealed Dillon's tape recorded conversation with Mrs. Miller. In addition, the failure of National to even interview Dillon's supervisor, Blount, until just two weeks prior to trial is tantamount to the inexcusable inadequate investigation we condemned in Bankers Life & Casualty Co. v. Crenshaw, supra. When all of these circumstances are viewed together, we conclude that the issue of bad faith and punitive damages was properly submitted to the jury.

DID THE TRIAL COURT ERR IN FAILING TO ALLOW DEFENSE COUNSEL TO WITHDRAW THEIR REPRESENTATION OF LAVERN DILLON?
The day before trial the defense attorneys moved to be relieved as counsel for Dillon citing a conflict of interest. A pretrial hearing was held on this motion. Here, National is arguing that because Dillon misrepresented the extent of his knowledge to the company a conflict of interest arose in defending both Dillon and National. National asserts that the burden of defending Dillon prevented it from defending the bad faith allegation by asserting that its actions had been the result of misrepresentations by Dillon. This argument fails for two reasons. First, as discussed above, the misrepresentations and non-disclosures of National's agents were not limited to Dillon. Blount and Brashier were equally culpable when it came to stymieing Mrs. Miller's claim. By simply asserting that Dillon was responsible for misrepresentations to the claims office, National was in no better position. Secondly, a directed verdict as to Dillon was entered at the close of the plaintiff's case; therefore, the defense attorneys were relieved of any obligation to put on proof as to Dillon's defense. They were then freed to point the finger of blame at Dillon, regardless of how legally ineffective that might have been. There is no merit to this argument.

DID THE COURT ERR IN FAILING TO GRANT THE DEFENSE MOTION TO DISMISS AGAINST CAROLINE MILLER?
Here National argues that the policy provided on its face that Marvin Miller was the insured. Caroline Miller was listed only as the "insured spouse." National then argues that by the terms of the policy, the death benefits for the child were payable only to Marvin Miller, if living, and otherwise to Caroline Miller. National asserts that it had no obligation to Caroline Miller except at the death of her husband.
We begin by noting that procedurally this argument is barred. Under Standard Life Insurance Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1977), National should have filed an objection to non-joinder as required by Miss. Code Ann. § 11-7-21 (1972). The Court in Veal held that had the non-joinder issue been raised before trial, the plaintiff would have been permitted to amend the declaration. By waiting until after the Millers had rested their case, National forfeited its objection to Mrs. Miller's participating in the suit.
Furthermore, the rule in this state is that an application for insurance which is attached to a contract is part of the insurance contract. Interstate Life & Accident Ins. Co. v. Flanagan, 284 So.2d 33 (Miss. 1973). Ordinarily where there is an ambiguity between the policy and the application, the terms of the policy will govern, Flanagan; however, this Court has also frequently held that any ambiguities in an insurance contract are to be strongly construed against the insurer. Bellefonte Insurance Co. v. Griffin, 358 So.2d 387 (Miss. 1978); Life and Casualty Ins. Co. of Tenn. v. Kelly, 202 Miss. 319, 32 So.2d 120 (1947).
*338 Finally, it is difficult to see any prejudice to National as the result of the failure to dismiss Caroline Miller. She sought no damages peculiar to her. The damages sought were the policy limits and punitive damages. Neither of those amounts were affected by Mrs. Miller's inclusion as a plaintiff. The policy limits were a predetermined figure and, as we have stated in Bankers Life & Casualty Co., supra and Snowden v. Osborne, 269 So.2d 858 (Miss. 1972), punitive damages are in the nature of punishment for the wrongdoing of the defendant and to set an example so as to deter others from similar behavior. The failure of National to timely object to Mrs. Miller's inclusion as a plaintiff and the absence of any prejudice leads us to find no merit to this assignment of error.

DID THE CIRCUIT COURT ERR IN ALLOWING THE TAPE RECORDED CONVERSATION BETWEEN MRS. MILLER AND DILLON INTO EVIDENCE?
Although we have previously disapproved of attorneys secretly tape recording conversations with adverse parties, Netterville v. Miss. State Bar, 397 So.2d 878 (Miss. 1981), we have also held that the admission of a tape recording and transcript into evidence under like circumstances was fully justified. Wilkins v. Bancroft, 248 Miss. 622, 160 So.2d 93 (1964). We take this opportunity to clarify our position. An attorney's actions in secretly tape recording conversations with adverse parties cannot be condoned. In J.C. Penney Co. Inc. v. Blush, 356 So.2d 590 (Miss. 1978), this Court adopted the formal opinion 337, A.B.A. Committee on Ethics and Professional Responsibility, which stated in part: "The committee concludes that no lawyer should record any conversation whether by tapes or other electronic device, without the consent or prior knowledge of all parties to the conversation." Nevertheless, while we cannot condone the attorney's actions here, we do not regard the introduction of the tape as reversible error. Dillon freely admitted the conversation and its contents and the parties had stipulated to the accuracy of the transcription. Because Dillon conceded having made the statements we conclude that there was no showing of prejudice. We therefore conclude that there is no merit to this assignment of error.

THE AMOUNT OF PUNITIVE DAMAGES
Here National argues that the amount of punitive damages awarded was excessive. They relate the $350,000 punitive damage award to the $2,500 award of actual damages. Punitive damages are designed to provide punishment and deterrence. In Commodore Corp. v. Bailey, 393 So.2d 467 (Miss. 1981), we stated: "We have held many times that in the event the jury awards punitive damages, the amount is solely within the jury's discretion unless arbitrary and unreasonable. The amount cannot be determined by any fixed rule." See also, Bankers Life Ins. Co. v. Crenshaw, supra.
In the instant case, National Life has a net worth of $470,000,000. It had net profits for the year 1981 of $134,000,000. Based on those figures, we are of the opinion that the punitive damages awarded in the amount of $350,000 are not excessive.
We have carefully reviewed the other assignments of error and find them wholly without merit. In our opinion National received a fair trial on all issues and was not subjected to any prejudicially erroneous rulings of the trial court. We therefore affirm the judgment of the Circuit Court of Forrest County against National Life and Accident Insurance Company in the amount of $352,500 in favor of Caroline Miller and Marvin Ramsey Miller, Sr.
AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and PRATHER, ROBERTSON, SULLIVAN and ANDERSON, JJ., concur.
HAWKINS and SULLIVAN, JJ., specially concur.
*339 HAWKINS, Justice, specially concurring:
In all likelihood Dillon's and Blount's sole source of income from National Life was on commission. Furthermore, their largest commission came from the initial premium paid on an insurance policy.
If the policy was issued following the application, they kept the commission. If the policy was not issued, the premium had to be refunded.
When the soliciting agent, rather than the applicant fills in the application, it is naive to assume there is not a strong temptation on his part to ignore an answer the applicant gives which would prevent the company's issuing a policy, which would "knock out" a sale.
The insurance companies surely know this. Yet, they permit their agents to be put in such conflict of interest positions, only to assert later, with a presumably straight face, that precisely what happened in this case should never occur.
Not only this, having approved a system or practice which encourages giving false answers (by their own agents) to questions on their application forms, they use the deceit of their own employees as a weapon to deny a claim.
It would be quite simple to remove from the agent any responsibility or authority to fill in the application form. The question then follows, why don't insurance companies do so?
The answer, for insurance companies such as this defendant, is not savory.
Justice Lee makes this very point. Did National Life know, or have every reason to know, that Blount and Dillon had been told by Mrs. Miller that her son had a heart problem when the application was taken? When she made the claim for her son's death, she told the company she had told Dillon and Blount the truth. Yet the company waited eleven months after rejecting her claim, and just two weeks before trial before it ever so much as questioned Dillon and Blount, its own employees, about the circumstances surrounding the application.
This iniquitous practice of National Life has a parallel in Bankers Life and Casualty Co. v. Crenshaw, 483 So.2d 254 (1985). Bankers Life denied a claim on a policy provision it knew was untenable. It played the odds, and in Crenshaw's case it lost. National Life could play the odds with its practice of encouraging agents to submit false applications and then be able to deny a claim because the application was false. In this case National Life has played the odds and lost.
A punitive damages award in this case is quite proper. Again, a court has been called upon to redress grievances which could be avoided by proper state regulation of insurance company practices.
SULLIVAN, J., joins this opinion.