552 So.2d 827 (1989)
MALTA LIFE INSURANCE CO.
v.
The ESTATE of George Wayne WASHINGTON, Deceased.
No. 07-58462.
Supreme Court of Mississippi.
September 20, 1989.
Rehearing Denied October 18, 1989.
Peter L. Corson, Earl Keyes, Keyes Moss Piazza & Woods, Jackson, for appellant.
Timothy Alan Ford, Carnathan Malski & Ford, Tupelo, Robert E. Richardson, Smyrna, Ga., for appellee.
En Banc.
*828 ANDERSON, Justice, for the Court:
On August 10, 1982, George Wayne Washington, age 56, obtained from First National Bank of Pontotoc a loan in the amount of $53,048.16, including interest and credit life insurance premium. Eddie Ray, the bank officer who handled the loan, issued a credit life policy for this amount through Malta Life Insurance Company, for which the bank was an authorized agent. On April 13, 1983, Washington obtained another loan from First National Bank in the amount of $41,946.24. The proceeds of this loan were used to pay installments and interest on pre-existing loans, including the loan of August 10, 1982. Eddie Ray also handled this loan, and issued a policy of credit life insurance through Malta in the amount of $42,100.00, effective April 15, 1983.[1] A copy of the certificate of insurance was given to Mr. Washington. A premium of $353.64 was charged for the credit life insurance, this amount being included in the amount of the loan. The bank received a 50% commission of the gross premium.
Mr. Washington died on May 2, 1983, seventeen days after the effective date of the policy. At the time of his death, the balance of the August 10, 1982 loan was $31,282.58. This amount was paid by Malta to First National Bank. Malta's Master Policy with First National Bank contained a provision limiting the total amount of coverage on any one debtor, ages 17 through 59, to $50,000.00. Based on this provision, Malta refused to pay an amount in excess of $50,000.00, but did pay $18,717.42  the difference between $50,000.00 and the balance of the August, 1982 loan  on the April, 1983 loan. (Malta also paid $50,000.00 to the Bank of Pontotoc under a credit life policy issued by that bank to Washington under the name "G.W. Washington.") First National Bank subsequently brought suit against Washington's estate, claiming right under a security agreement to certain articles of personal property used to secure the April, 1983 loan. Washington's estate cross-claimed against the bank as agent of Malta Life Insurance Company and joined Malta as a cross-defendant. The Estate alleged that the policy of insurance issued effective April 15, 1983, was in full force and effect at the time of Washington's death, and that the cross-defendants were jointly and severally liable for the balance on the April, 1983 loan, which at the time of trial was $30,894.07, including accumulated interest. After a full trial, the chancellor dismissed the estate's cross-claim against the bank. As to the cross-claim against Malta, however, the trial court found in favor of Washington's estate and ordered Malta to pay the loan balance of $30,894.07. From that judgment, Malta appeals.

I. DID THE TRIAL COURT DISREGARD THE PLAIN LANGUAGE OF THE MASTER POLICY?
On appeal, Malta argues that the trial court's decision was contrary to the plain language of the master policy and the certificates of insurance, which both provide for a $50,000.00 limit on coverage.
Although the master policy does provide in the "Amount of Insurance" paragraph that "[i]n no event shall total insurance in force as to any one debtor exceed a maximum of $50,000.00 of insurance," it is clear that that clause is rendered virtually meaningless by other language in the policy. In a subsequent paragraph, the master policy provides as follows:
The Company shall have the right to cancel any insurance on the life of the Debtor in excess of those amounts listed in the Amount of Insurance paragraph contained in this Policy, within thirty days after receipt at the Home Office of the Company, Jackson, Mississippi, of written notice of the granting of such insurance. Such cancellation shall be given by written notice to the Creditor.
(R. 116) (Emphasis added.) The language of this paragraph clearly contemplates that *829 policies may be written for amounts in excess of $50,000.00. Furthermore, Eddie Ray, the bank officer who issued the policy in question to Mr. Washington, testified that he had issued credit life policies in excess of $50,000.00 with Malta "a few times" in the past. Mr. Washington himself had previously been issued a single policy in excess of $50,000.00. There is simply no merit to the appellant's argument that the provision limiting coverage on any one debtor to $50,000.00 was an absolute limitation.
It should also be noted that the master policy provides not that the Company may reject the excess coverage, but that it may cancel the excess coverage within thirty days after receipt of notice of the granting of the insurance. The use of the word "cancel" clearly contemplates a policy that has already become effective.
In National Life and Accident Insurance Company v. Miller, 484 So.2d 329 (Miss. 1985), appeal dismissed, ___ U.S. ___, 108 S.Ct. 2007, 100 L.Ed.2d 596 (1988), this Court stated that "an insurance company, like other principals, is bound by knowledge of, or notice to, its agent within the general scope of his authority, notwithstanding a contrary provision in the application or policy." Id. at 334-35, quoting 32 C.J. 1069 (emphasis added). The Court further stated that "a policy delivered with full knowledge [by the agent] of a state of facts which under its written stipulations, would render the insurance void should be binding upon the company." Id. at 335, quoting Big Creek Drug Co. v. Stuyvesant Insurance Co., 115 Miss. 333, 75 So. 768 (1917). In the instant case, First National Bank delivered a certificate of insurance to Washington for an amount, which when coupled with other existing coverage, exceeded the limit specified in the master policy. Because the bank was an agent of Malta, authorized to issue policies of credit life insurance, Malta should be bound by the policy issued to Washington, even if under the stipulations of the master policy, the insurance would exceed the $50,000 limitation placed upon its agent, Eddie Ray.

II. DID THE TRIAL COURT ERR IN DISREGARDING MALTA'S CLAIM THAT COVERAGE WAS ONLY TENTATIVE UNTIL APPROVAL BY MALTA ITSELF?
Malta argues, in essence, that credit life coverage on the April, 1983 loan was tentative, that Ray made it clear to Washington that he would not be covered until Ray could get approval from Malta for the excess amount of coverage. Ray testified at trial that he discussed with Washington that there would be some difficulty in getting coverage on the loan. According to Ray, Malta would have to be offered some "enticements" before they would place the coverage.[2] The fallacy of the argument that coverage was only tentative is obvious, in view of the fact that a certificate of insurance was issued to Washington. This certificate was not merely a conditional receipt. It was a policy of insurance. It stated:
In consideration of premiums received, MALTA LIFE INSURANCE COMPANY hereby certifies that under and subject to the terms and conditions of a Master Creditor-Debtor Insurance Policy issued to the Creditor named herein, the above named are insured against death.
Although under the terms of the policy Malta had the right to cancel the policy within thirty days after written notice of the granting of the insurance, Washington was covered until such time as the policy was cancelled. Malta did not cancel the policy prior to Washington's death. It attempted to deny coverage, however, after his death. The chancellor correctly found that Malta could not cancel the policy after Washington's death. As this Court stated *830 in Gulf Guaranty Life Insurance Company v. Middleton, 361 So.2d 1377 (Miss. 1978):
To relieve [the insurer] of liability on this policy would equate the facts hereof to a life insurance policy good and enforceable if the insured lives, but rendered void by his death.
361 So.2d at 1383.

III. DID RAY HAVE EITHER ACTUAL OR APPARENT AUTHORITY TO ISSUE A CERTIFICATE OF INSURANCE EXCEEDING THE POLICY LIMITS?
Under the terms of the master policy, Ray may have had actual authority to issue a certificate of insurance in excess of $50,000.00. As noted already, the master policy provided:
The Company shall have the right to cancel any insurance on the life of the Debtor in excess of those amounts listed in the Amount of Insurance paragraph contained in this Policy, within thirty days after receipt at the Home Office of the Company, Jackson, Mississippi, of written notice of the granting of such insurance. Such cancellation shall be given by written notice to the Creditor.
(R. 116) (Emphasis added.) Again, this language appears to contemplate that a policy in excess of $50,000.00 may be actually placed in effect by the agent before notice is given to the Company that such coverage is being granted. John Emory, Senior Vice-President and Secretary of Malta Life Insurance Company, testified that, while Malta liked for the bank to clear it with the Company before writing a policy in excess of $50,000.00, the bank sometimes wrote policies over $50,000.00 without clearing it. He explained, however, that the master policy allowed Malta 30 days after receipt of such a policy within which to cancel the excess amount.
Whether or not Ray had actual authority to issue a policy in excess of $50,000, it cannot be seriously contended that he lacked apparent authority. He had already issued one policy to Washington in excess of $50,000.00, and Malta had ratified the excess coverage. It is true that Ray testified that he issued the policy covering the August, 1982 loan for $53,048.16 only after contacting an officer of Malta by phone for approval. He stated that he did not obtain approval from Malta to issue a policy covering the April 13, 1983 loan, and that he made it clear to Washington that it would be difficult to obtain coverage on that loan. This testimony would be persuasive if Ray had issued a conditional receipt, instead of a Certificate of Insurance. But the fact remains that a Certificate of Insurance was issued, and the credit life premium was charged and added to the amount of Washington's loan.
In Southern United Life Insurance Company v. Caves, 481 So.2d 764 (Miss. 1985), we rejected the insurance company's argument that its agent, a bank officer licensed to write policies of credit life insurance, had no binding authority to waive a condition of insurability. There, the agent issued a certificate of credit life insurance to Caves, even though the agent knew that Caves had previously suffered a serious heart attack. The certificate of insurance contained a condition that the insured must be in insurable health at the time it was written, and made reference to the master policy which provided that only the president, vice president, secretary or assistant secretary of the insurance company had authority to waive the conditions of the policy. The master policy provided that if the company should find an applicant to be an uninsurable risk, according to its under-writing standards, it could decline the insurance within 31 days from the time the certificate was received by the company. Caves died of a heart attack approximately three weeks after issuance of the certificate. The heart attack was associated with his pre-existing heart condition. After notification of Caves' death, the insurance company conducted an investigation into Caves' medical history and, finding that he had not been in insurable health at the time the certificate was issued, rejected a claim for payment under the policy. In an action brought by Caves' estate against the insurance company, the trial court granted summary judgment in favor of the estate on *831 the issue of liability. A jury awarded punitive damages against the insurance company for bad faith refusal to pay the claim. On appeal, this Court affirmed, both as to liability and as to punitive damages. The Court considered Miss. Code Ann. § 83-17-1 (1972), which provides in part:
Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, ... or who shall receive or deliver a policy of insurance of any such company, .. . or receive, collect, or transmit any premium of insurance, ... or do or perform any other act or thing in the making or consummation of any contract of insurance for or with any such insurance company, other than for himself, ... shall be held to be the agent of the company for which the act is done or the risk is taken, as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract.
Finding section 83-17-1 to be applicable, the Court stated:
It is wholly admitted that [the agent] accepted payment of the premium knowing of the serious pre-existing condition of the insured which she failed to communicate to the company. As a matter of law, this knowledge was imputed to the principal, Southern United [Life Insurance Company]. The condition of insurability was effectively waived and the acts are binding upon the company.
481 So.2d at 767.
In the instant case, it is admitted that the agent bank accepted payment of the credit life premium and issued a policy of insurance, knowing that it was for an amount in excess of the limit stated in the policy. We see no distinction between the agent's waiver of the limitation on amount of coverage in the instant case and the agent's waiver of the condition of insurability in Caves.
The facts in Gulf Guaranty Life Insurance Company v. Middleton, 361 So.2d 1377 (Miss. 1978), are similar to those in the instant case. There, Gulf Guaranty Insurance Company issued to Citizens Bank of Columbia, Mississippi, a master insurance policy authorizing the bank to issue policies of credit life insurance to certain of the bank's debtors. The master policy, by endorsement, contained a provision that the maximum amount of insurance on the life of any one debtor from age 15 to 55, inclusive, was $20,000.00. From age 56 to 60 the maximum was $10,000.00. On October 23, 1975, Middleton, who was at that time 57 years of age, was issued a credit life certificate in the amount of $10,000.00 through Gulf Guaranty. Middleton at that time had other loans with the bank with credit life insurance written through Gulf Guaranty, making a total of $19,050.00 credit life insurance through Gulf Guaranty. This total was $9,050.00 in excess of the maximum amount authorized under the master policy.
On six occasions prior to the issuance of the October, 1975 certificate, the bank had issued to Middleton certificates of insurance through Gulf Guaranty which together resulted in an amount of insurance in excess of Gulf Guaranty's policy limits. In none of those six instances did Gulf Guaranty refuse or reject the excess coverage. On October 24, 1975, one day after issuance of the $10,000.00 certificate, Middleton died. Gulf Guaranty paid $9,050.00 on Middleton's debts and offered to pay an additional $950.00 plus the unearned premium from the $10,000.00 certificate, but this offer was refused.
Middleton's estate brought suit against Gulf Guaranty, Citizens Bank, and the bank officer who was general agent for Gulf Guaranty. After a bench trial, judgment was entered against Gulf Guaranty for the $10,000.00 plus interest on $9,050.00. (Presumably, interest was not assessed on the $950.00 which Gulf Guaranty had offered to pay, but which had been refused.)
On appeal, this Court affirmed the judgment against Gulf Guaranty. The Court rejected Gulf Guaranty's argument that there could have been no ratification of the issuance of the $10,000.00 certificate, since it had not received a copy of the certificate *832 and had no knowledge of its existence at the time of the insured's death. The Court stated:
Ratification here is not based upon the issuance of this certificate, but stems from [Gulf Guaranty's] ratification and approval with knowledge of the facts, of the six instances of excess insurance over a period of three years as shown in this case without objection on account thereof and its acceptance of the benefit, the premiums therefrom.
361 So.2d at 1382. The Court emphasized that in insurance agency relationships, general laws of agency apply. The Court also stated:
The power of an agent to bind his principal is not limited to the authority actually conferred upon the agent, but the principal is bound if the conduct of the principal is such that persons of reasonable prudence, ordinarily familiar with business practices, dealing with the agent might rightfully believe the agent to have the power he assumes to have. The agent's authority as to those with whom he deals is what it reasonably appears to be. So far as third persons are concerned, the apparent powers of an agent are his real powers.
Id. at 1383 (quoting Steen v. Andrews, 223 Miss. 694, 78 So.2d 881 (1955) (emphasis added).
Based on the above-cited authority, we believe the conclusion is inescapable that Eddie Ray had apparent authority to issue a certificate of insurance exceeding the policy limits. Malta furnished the bank with blank Certificates of Insurance bearing the Malta logo. The bank regularly issued policies of credit life insurance through Malta using these forms. The bank had previously issued policies in excess of $50,000.00 on several occasions. It had issued Washington himself a prior policy in excess of $50,000.00. Under these circumstances, a person of reasonable prudence might rightfully believe that the bank had the authority to grant coverage on behalf of Malta for an amount in excess of $50,000.00. Where an officer of the bank, an authorized agent of Malta, accepted a premium for credit life insurance, issued a Malta Life Insurance Company certificate of insurance, and delivered a copy of the certificate to the debtor, his actions should be binding on Malta.
We therefore affirm the chancellor's holding that the credit life policy issued effective April 15, 1983, was in full force and effect at the time of Washington's death.
AFFIRMED.
DAN M. LEE, P.J., and PRATHER, SULLIVAN and PITTMAN, JJ., concur.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and BLASS and ROBERTSON, JJ., dissent.
BLASS, Justice, dissenting:
George Wayne Washington borrowed $53,048.16 from the First National Bank of Pontotoc in August of 1982. He was told by Eddie Ray, the bank officer handling the matter, that he could only obtain $50,000 insurance from Malta Life Insurance Co. unless an exception could be arranged. While Mr. Washington was present, Mr. Ray called the insurance company and was able to obtain coverage of the $3,048.16 excess. In April of the next year, Washington borrowed $41,946.24 and wanted to insure that also. He was told by Mr. Ray, again, that only a total of $50,000 on the life of a single debtor would be obtainable unless he could persuade the company to do it by promising them more business or some other inducement. Washington and Mr. Ray agreed that he would go ahead and issue the certificate and Ray would try to get it approved. If he could not, they would make some other different arrangement. Ray issued the certificate and gave a copy of it to Washington. The certificate contained the following language: "LIMITATIONS: Under the master creditor-debtor insurance policy, in no event shall total insurance in force as to any debtor exceed a maximum of $50,000 for insurance, ages through 59, inclusive or for a period of more than 120 months duration." This statement of limitation, handed to Washington in writing, was precisely in accord with the statements Ray had made to *833 Washington prior to handing him the certificate. It would seem that the fact that the agent verbally told Washington that he did not have the authority to write insurance for him in excess of $50,000 in all, and the fact that the certificate handed to Mr. Washington stated that in no event should total insurance be in force in an amount exceeding $50,000 with respect to an individual his age would seem, without any necessity of further argument or citation of authority to dispose of the question of the apparent authority of the agent. Clearly, under the policy, he did not have actual authority and certainly there was no reason for Washington to believe that he had such authority.
The majority opinion, on page 829, quotes the master policy with respect to the $50,000 limitation and then quotes another paragraph from the master policy saying that the company would have the right to cancel any insurance on the life of the debtor in excess of the amounts listed in the amount of insurance paragraph in the policy. The paragraph goes on to say that this could be done within 30 days after receipt in the home office of the notice of the granting of such insurance. That well may have been the understanding between the insurance company and the bank but it was not the understanding between the insurance company and Washington. The limitation paragraph set out on the certificate handed to Mr. Washington is that, "in no event" should the total insurance in force exceed $50,000, but it does not contain any cancellation paragraph making reference to any excess over that amount. The cancellation statement in the certificate merely says, "The company shall have the right to cancel the insurance on the life of either or both debtors within 30 days of the receipt at the home office of the company, at Jackson, Mississippi, of written notice of the granting of such insurance." In other words, the cancellation clause does not purport, in any way, to modify the "in no event" clause. The certificate tells Washington that he cannot have more than $50,000 in force and that he may not have any if he gets notice within 30 days of the writing of a policy. It should be remembered, I think, that Washington probably never saw the master policy. It is clear from the record, however, that he was handed the pink copy of the certificate of insurance and that very plainly told him that he had no insurance in excess of $50,000. There was not a word in that certificate about the company having the right to cancel the insurance in excess of $50,000.
I respectfully submit that we are dealing here with a solemn contract, plain and clear on its face, free from ambiguity, unaffected by any prior inconsistent dealing, and that this Court has no right to rewrite the contract. Roberts v. Grisham, 487 So.2d 836, 838 (Miss. 1986). Section 16 of our Constitution accords such great dignity to the obligation of contracts and it would seem too clear for argument that a corresponding obligation devolves upon this Court not to disregard them.
Looking back, again, at the facts we have recited and the plain, clear, and unequivocal language of the certificate it seems evident to me that the conclusion of the majority opinion under Point I is simply erroneous. The certificate, which is binding upon Washington, did not provide for the rejection of the excess coverage and allow cancellation within 30 days. On the other hand, it said that there could not be insurance above the $50,000 and said that it could cancel for any reason within 30 days. Again, there was no reference to the excess whatsoever in the cancellation provision of the certificate.
Looking at Point II in the majority opinion, I would point out with deference, that the majority says that the certificate was issued to Washington and emphasizes that fact by underlining those words. In response to that section of the opinion, I would simply say we must also read the limitations section of the certificate which was issued. We do not have the option, in construing a written instrument, to select the parts that we would like to have in force and ignore those which are not in accord with our views.
In this section, this Court quotes Gulf Life Insurance Co. v. Middleton, 361 So.2d 1377 (Miss. 1978). It is very clear that Gulf *834 has no application to this case. In that case a pattern of conduct, repeated at least 6 times, had plainly and clearly clothed the agent with authority to act as he acted. The exact opposite is true here in that the agent had never behaved in such a way as to indicate that he had the authority himself to write the excess coverage.
Section III of the majority opinion deals with the question of apparent authority and I believe that has been adequately discussed before. Neither the cases nor the statutes cited, in my judgment, are supportive of the position taken in view of the actual facts which obtain in this case. The majority opinion again quotes from the master policy but fails to quote from the certificate. The certificate and the conduct of the agent set out in the record here are in complete accord.
The learned chancellor was clearly and manifestly in error with respect to his conclusions and findings about the second loan. He found that the second loan was the same indebtedness for which the original coverage was made. The record, however, clearly shows that the second loan was to cover other indebtednesses and that only one payment on the first loan was involved in the sum borrowed on the second occasion. With deference to the chancellor, it is equally clear that he failed to examine the language of the certificate. The insurance company has not dealt harshly with Washington in that it has not raised the question of the additional $50,000 coverage in another bank and has paid the full $50,000 in this case, despite the fact that only $31,282.58 was due.
I would reverse and, therefore, respectfully dissent.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and ROBERTSON, J., join this dissent.
NOTES
[1] The record does not reflect the date of issuance of the certificate, but reflects an effective date of April 15, 1983, two days after the date of the loan. Although Ray testified that generally the effective date of insurance coverage is the date of the loan, there is no explanation in the record for the two-day difference in this instance.
[2] At trial, Ray could not recall whether he was supposed to have notified Washington if and when he got approval for the policy. Furthermore, he failed to show that he took any steps whatsoever to obtain Malta's approval of the coverage in the nineteen days between the date of the loan and the date of Washington's death, an effort he certainly should have made if there was no coverage in effect. Instead, Ray mailed the original of the Certificate of Insurance to Malta under standard procedures, without even the benefit of a cover letter.