481 So.2d 764 (1985)
SOUTHERN UNITED LIFE INS. CO. and First State Bank of Waynesboro
v.
Mavon Ard CAVES.
No. 54867.
Supreme Court of Mississippi.
November 27, 1985.
*765 Joe Clay Hamilton, Hamilton & Boling, Meridian, John R. Gunn, Waynesboro, for appellants.
E. Gregory Snowden, Bourdeaux & Jones, Meridian, for appellee.
Before PATTERSON, C.J., and HAWKINS and ANDERSON, JJ.
ANDERSON, Justice, for the Court:

I.
This appeal is an action wherein Mavon Ard Caves, administratrix of the Estate of Elvin Allen Caves, sued Southern United Life Insurance Company, (hereinafter Southern) for failing to pay an amount due under a credit life insurance policy. The trial court granted summary judgment for Mrs. Caves on the issue of liability. The issue of punitive damages went to the jury, which awarded $10,000 damages to the appellee.
The appellants raised numerous assignments of error on this appeal. The main issues, however, are (1) whether summary judgment should have been granted and (2) whether the question of punitive damages should have been submitted to the jury. We are of the opinion that the trial court was correct in both rulings, and we affirm.

II.
Mr. Elvin Allen Caves, the deceased, purchased an automobile on January 8, 1982, financing it through First State Bank of Waynesboro. The loan transaction was conducted by Sue Tanner, an officer of the bank and undisputed licensed agent for Southern United Life Insurance Company. Mrs. Tanner had known Mr. Caves and done business with him for many years and admittedly knew of a prior serious heart attack he had suffered in 1974; however, *766 she also knew that he had been engaged in construction and oil field work since that time.
During the loan transaction, Mrs. Tanner asked Mr. Caves if he desired credit life insurance on the loan and he indicated that he did. Tanner then asked Caves if he had a physical examination for his current employment and he indicated that he had. Tanner then checked the appropriate box for credit life insurance and had Caves sign and retain a copy of the certificate. Tanner was under no duty or direction from Southern to inquire about the health of the potential insureds, but was to use her own discretion in issuing insurance to those applying. The certificate contained a condition that the insured must be in insurable health at the time it was written and referred to the master policy (not in the insured's possession) which provided that only the president, vice president, secretary or assistant secretary, had power to change, modify or waive the conditions of the policy. The certificate also provided that the company had 31 days from the receipt of their copy in the home office to investigate and accept or reject the insurance.
Caves had, in fact, suffered a heart attack in 1974 and had been under a doctor's care since that time. He was taking three different medicines, including nitroglycerin and collecting total social security disability benefits. He was also in pain and had been diagnosed as having a progressively worsening heart disease.
The total payment for the loan was $11,902.80, less $1,041.50 for credit life and disability insurance. The cost of credit life alone was $416.60.
Caves died on January 30, 1982, before the first loan payment was made. The cause of death was a heart attack associated with his pre-existing heart condition. Southern was notified of the insured's death, and payment of the claim was postponed pending investigation. The standard investigation by Equifax (which ordinarily only determined character and mode of living) was ordered, and the response was that the insured had already died. After obtaining medical records and reports of the insured, the insurance company rejected the claim, finding that the insured was not in insurable health at the issuance of the policy. The company then refunded the $145.82 premium, less their commission.
Mavon Ard Caves, the widow and administratrix brought suit on behalf of the estate. The court granted summary judgment for the plaintiff/appellee, directing Southern to pay the amount of the policy in full to the bank, the creditor beneficiary. The judge held that the question of punitive damages was a jury issue and the jury awarded $10,000 punitive damages to Mrs. Caves.

III.
The question of liability is not a difficult one. The appellant bases its refusal to pay on its contention that Caves was not in insurable health at the time of the issuance of the certificate. The policy provided that this condition could not be waived by the soliciting agent. Appellants contend that Tanner was not aware of the extent to which the insured's illness had progressed at the time and even if she was, she had no binding authority to waive the condition. It is a well established principle that the general laws of agency apply to insurance agency relationships. Gulf Guaranty Life Ins. Co. v. Middleton, 361 So.2d 1377 (Miss. 1978). In National Life v. Miller, 484 So.2d 329 (1985), the insurance company took the same position in seeking to disclaim the knowledge of its agents. The court stated:
National next asserts that the knowledge gained by Dillon and Blount while taking the application from Mrs. Miller cannot be imputed to it because they were merely soliciting agents. That position is contrary to the law of this state as defined both by statute and case law.
That case went on to cite Mississippi Code Annotation, Section 83-17-1 (1972):
Agent defined.

*767 Every person who solicits insurance on behalf of any insurance company, or who takes or transmits, other than for himself, an application for insurance or a policy of insurance, or who advertises or otherwise gives notice that he will receive or transmit the same, or who shall receive or deliver a policy of insurance of any such company, or who shall examine or inspect any risk, or receive, collect, or transmit any premium of insurance, or make or forward a diagram of any building, or do or perform any other act or thing in the making or consummation of any contract of insurance for or with any such insurance company, other than for himself, or who shall examine into or adjust or aid in adjusting any loss for or on behalf of any such insurance company, other than for himself, or who shall examine into or adjust or aid in adjusting any loss for or on behalf of any such insurance company, whether any of such acts shall be done at the instance or request or by the employment of the insurance company, or of or by any broker or other person, shall be held to be the agent of the company for which the act is done or the risk is taken, as to all the duties and liabilities imposed by law, whatever conditions or stipulations may be contained in the policy or contract. Such person knowingly procuring, by fraudulent representations, payment or the obligation for the payment of a premium of insurance shall be punished by a fine of not less than one hundred dollars nor more than five hundred dollars, or be imprisoned for not more than one year.
This statute is equally applicable to the case sub judice. It is wholly admitted that Tanner accepted payment of the premium knowing of the serious pre-existing condition of the insured which she failed to communicate to the company. As a matter of law, this knowledge was imputed to the principal, Southern United. The condition of insurability was effectively waived and the acts are binding upon the company. Gulf Guaranty, supra; Trawick v. Manhattan, 447 F.2d 1293 (5th Cir.1971).
Moreover, the master policy also contained a clause that provided:
EVIDENCE OF INSURABILITY. The Company may require evidence of insurability satisfactory to it with respect to each eligible debtor who applies for insurance hereunder with respect to an indebtedness. If the Company finds that any applicant is not an insurable risk according to its underwriting standards, it reserves the right to decline the insurance on the life by indicating its intention in writing to the Creditor within 31 days from the time the individual Certificate was received by the Company. If the debtor should die during the 31 days, the insurance shall be deemed to have been in effect if the Company, acting on its regular underwriting methods, would have accepted the insurance. Any premium paid under this policy for insurance not granted will be refunded to the Creditor on demand.
This provision is consistent with the agent's understanding that the insurance would go into effect at the time the certificate was issued and the premium paid. Caves died prior to the expiration of the 31 days. Therefore, had Caves passed the usual underwriting procedures, the insurance would unquestionably have been effective. Southern's usual procedure was an investigation by Equifax, which ascertained only character, general reputation, personal characteristics and mode of living. (There was normally no follow up procedure to determine the medical status of potential insureds.) No evidence was offered to show that Caves would have been rejected under Southern's regular underwriting methods.
The decedent had had credit life policies written on his loans after his heart attack without question. In fact, he was also covered on other loans by two other credit life companies at the time of his death, both of which promptly paid the amounts due under the policies. Southern's own agent testified that on previous occasions, it had been the routine practice to accept the persons she recommended for coverage *768 with no further inquiry other than the standard Equifax report. It was only after Southern gambled and lost that it proceeded to make inquiries and extensive investigations into a medical history  inquiries not a part of its usual underwriting procedure.
Sue Tanner testified without contradiction that as an agent she was given no definite guidelines for determining who was or was not an insurable party. Southern did not require any written application or any inquiry regarding the medical history, hospitalization or health of the insured. It was Tanner's understanding, corroborated by her superiors in the company, that she was simply to use her own discretion in deciding who qualified for insurance. By its actions (or, more appropriately, by its inaction), Southern left the burden of assessing the insurability of potential customers to its agent, furnishing no criteria whatsoever for making such assessment. In essence, Southern hid behind a veil of self-imposed nescience.
Where an insurance company makes no effort to establish clear and meaningful guidelines to assist its agents in discerning persons eligible for coverage, but merely relies on the agents' judgment to select those persons appearing to be healthy, that company by its actions manifests an intention to "insure the world." In this case, there is ample evidence that Southern was liable for the policy and the court below acted quite properly in rendering summary judgment for the appellees.

IV.
The other major issue is whether the trial court was correct in allowing punitive damages. In the leading case of Standard Life Ins. Co. of Indiana v. Veal, 354 So.2d 239 (Miss. 1978), which involved the wrongful refusal by an insurance company to pay a claim due on a credit life insurance policy, this Court held:
Of course, if an insurance company has a legitimate reason or an arguable reason for failing to pay a claim, punitive damages will not lie, but in this case the defendant had no reason to contest the claim filed with it. We therefore hold that punitive damages were allowable.
The case at bar would certainly appear to be within the realm of the Veal standard. Southern knew or should have known that as a matter of law, it had no arguable or legitimate reason for refusal. Furthermore, even after the claim arose, Southern made no attempt to contact its agent to determine what imputable knowledge she had. Southern merely proceeded to investigate the medical history of the decedent, which was not its usual practice, in order to avoid liability.
Veal further stated:
This case demonstrates the necessity of awarding punitive damages when an insurance company refuses to pay a legitimate claim, and bases its refusal to honor the claim on a reason clearly contrary to the express provisions of its own policy. If an insurance company could not be subjected to punitive damages it could intentionally and unreasonably refuse payment of a legitimate claim with veritable impunity. To permit an insurer to deny a legitimate claim, and thus force a claimant to litigate with no fear that claimant's maximum recovery could exceed the policy limits plus interest, would enable the insurer to pressure an insured to a point of desperation enabling the insurer to force an inadequate settlement or avoid payment entirely. We are of the opinion that the refusal to pay the legitimate claim in this case was an intentional wrong and constituted an independent tort as contemplated in Progressive Casualty Insurance Co. v. Keys [317 So.2d 396 (Miss. 1975)] supra.

The Veal standards and principles have been embraced by a number of subsequent cases. The procedure for determining when punitive damages are a jury issue has been established by these cases.
Following a suggestion made in Blue Cross & Blue Shield of Ms. v. Campbell, 466 So.2d 833, 843 (Miss. 1985), this Court in State Farm Fire & Casualty Co. *769 v. Simpson, 477 So.2d 242 (Miss. 1985) reasoned that in the great majority of cases, where the insured is not entitled to a directed verdict on his underlying contract claim, it follows that the bad faith punitive damages issue should not be submitted to the jury. Conversely, where the insured is entitled to a directed verdict -or, its functional equivalent, summary judgment, see Stanton & Associates, Inc. v. Bryant Constr. Co., 464 So.2d 499, 504 (Miss. 1985)  it will often follow that the insured is entitled to have the jury consider the bad faith claim. It is this latter situation with which we are presented today.
In this case the trial court correctly found that Southern was liable on the policy and accordingly granted summary judgment for the appellee. There can be no question that under the cases cited, the issue of punitive damages was properly presented to the jury with adequate instructions allowing the jury to render an appropriate verdict.

V.
We find no merit in appellant's other objections with the possible exception of the granting of Instruction P-6, which reads as follows:
The Court instructs the jury that punitive damages may be awarded if you find from the evidence presented to you that the defendant Southern United Life Insurance Company acted in an intentionally wrong, insulting, abusive, or grossly negligent manner in failing or refusing to pay off its policy after Mr. Caves' death. The insurance company will be liable to pay punitive damages if it had no legitimate or arguable reason under Mississippi law for refusing to pay the claim, and this will be so even if the company's failure to pay was caused by the mistakes of its employees who may have misinterpreted the facts or misunderstood the law. The court instructs you that unless the defendant's reason for failing to pay is a reason which a reasonable person, knowing all the insurance company knows or is presumed to know, would honestly assert, then the defendant, Southern United Life Insurance Company, is liable to pay punitive damages to the plaintiff, Mrs. Mavon Caves. (Emphasis supplied).
This instruction raises questions in light of the language in the recently decided case of State Farm Fire & Casualty v. Simpson, 477 So.2d 242 (Miss. 1985), where this Court stated:
The term "arguable reason" is now frequently before the Court. In Blue Cross & Blue Shield of Ms. v. Campbell, 466 So.2d 833 (Miss. 1985), concerning such statement, we held,
"We have come to term an insurance carrier which refused to pay a claim when there is no reasonably arguable basis to deny it as acting in `bad faith,' and a lawsuit based upon such an arbitrary refusal as a `bad faith' cause of action."
466 So.2d at 842.
The term "arguable reason" does not diminish the rule regarding the resolution of punitive damages because the assessment is no different in "bad faith" cases than in other punitive damage cases. Standard Life v. Veal, supra, provides that punitive damages will not lie if the carrier has an arguable reason for denying the claim. It does not necessarily follow, however, that punitive damages are mandated by the absence of an "arguable reason."
This is so because the denial of a claim could be the result of an honest mistake or oversight  ordinary or simple negligence  not reaching the heightened status of an "independent tort" as set out in Veal, supra, and other cases.
The language complained of in Instruction P-6 is therefore improper. This instruction, however, cannot be said to be harmful or prejudicial because the appellants did not rely on the defense of mistake or negligence on its part. The instructions given, when considered together, provided sufficient directions to the jury under the Veal standard. See Byrd v. F-S Prestress, *770 Inc., 464 So.2d 63, 66 (Miss. 1985); Jackson v. Griffin, 390 So.2d 287, 290 (Miss. 1980).

VI.
Co-defendant, First State Bank of Waynesboro, is not a party to the appeal of punitive damages, nor does it contest the holding of the summary judgment as to Southern. It brings one assignment of error, and that is that the trial court, in granting summary judgment to the plaintiff, erred in ruling that defendant First State Bank was not entitled to repossess or compel the surrender of the subject automobile and the plaintiff had not been compelled or required to surrender possession of said automobile. The appellant First State Bank seeks to have this language stricken in order to protect its position as lienholder should the liability of Southern United Life be reversed. Since the judgment against Southern United is affirmed, we may safely dismiss this assignment.
AFFIRMED ON DIRECT APPEAL. DISMISSED AS TO CROSS APPEAL.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, ROBERTSON and SULLIVAN, JJ., concur.