# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2005-CA-02082-SCT

*CLYDE ANGLIN*

*v.*

*GULF GUARANTY LIFE INSURANCE COMPANY*

| | |
|---|---|
| DATE OF JUDGMENT: | 10/14/2005 |
| TRIAL JUDGE: | HON. PAUL S. FUNDERBURK |
| COURT FROM WHICH APPEALED: | LEE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | DANA GAIL DEATON |
| | CHRIS H. DEATON |
| | GRANT M. FOX |
| | SARA MARTIN FOX |
| ATTORNEY FOR APPELLEE: | THOMAS WICKER |
| NATURE OF THE CASE: | CIVIL - INSURANCE |
| DISPOSITION: | REVERSED AND REMANDED - 04/19/2007 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE SMITH, C.J., CARLSON AND RANDOLPH, JJ.**

**RANDOLPH, JUSTICE, FOR THE COURT:**

¶1.     In conjunction with two separate loans, Clyde Anglin purchased credit life insurance coverage and monthly disability insurance coverage underwritten by Gulf Guaranty Life Insurance Company ("Gulf Guaranty"). The certificates of insurance were issued to Anglin without a request to answer any health questions preprinted on the application or otherwise. The certificates of insurance reserved the right for Gulf Guaranty to *decline* coverage within ninety days of each loan. Because of information acquired in conjunction with a third loan and purchase of credit life and monthly disability insurance coverage, and within ninety days

of the first two purchases, Gulf Guaranty *declined* Anglin's monthly disability insurance coverage (but only on the second certificate of insurance), and *cancelled* his credit life insurance coverage on all certificates of insurance, including the third policy, which is not at issue in this appeal. Subsequent to his receipt of the certificates of insurance, but before the declination of one policy and cancellation of three others, Anglin was diagnosed with an incurable, fast-progressing disease, amyotrophic lateral schlerosis ("ALS" or "Lou Gehrig's disease"). Prior to his death in May 2000, Anglin filed suit against Gulf Guaranty.

¶2. On September 13, 2005, Gulf Guaranty filed a motion for summary judgment asserting it properly "cancelled and/or declined coverage within ninety (90) days of the date of the loans in question . . . ." In response, Anglin's estate argued that Gulf Guaranty had only the right to *decline* coverage, not *cancel* coverage. The Circuit Court of Lee County granted Gulf Guaranty's motion for summary judgment. From that ruling comes this appeal.

**FACTS**

¶3. On July 31, 1998, Anglin refinanced two loans and purchased credit life and monthly disability insurance coverage underwritten by Gulf Guaranty. The certificate of insurance pertaining to the first loan provided $15,051.72 in credit life insurance coverage and $418.11 in monthly disability insurance coverage (Certificate Number 1746754)[1]. The second certificate of insurance provided $21,500.72 in credit life insurance coverage and $449.19

---

[1]This same certificate encompasses Certificate Number 1746754*0*, which is the credit life insurance coverage and Certificate Number 1746754*7*, which is the monthly disability insurance coverage.

in monthly disability insurance coverage (Certificate Number 1746755)[2]. Each certificate of insurance clearly and unambiguously states that "[Gulf Guaranty] agrees to insure the Insured Debtor(s)[3] as specified in this Certificate, subject to the provisions contained in the Group Credit Insurance policy." Each certificate of insurance further provided that "[i]f [Gulf Guaranty] finds the Insured Debtor is not an insurable risk, it reserves the right to *decline* the Insurance *within* 90 days of the Date of Loan *by mailing notice of declination directly to the Creditor Beneficiary and returning all premiums* collected for this Certificate." (Emphasis added).[4] The deposition testimony of Ellen Methvin, vice president and office manager of Gulf Guaranty, revealed that agents such as loan officer Brian Porter receive no training or guidelines as to underwriting criteria in processing applications for insurance.[5] While the preprinted application for insurance form contained health questions, Gulf Guaranty did not require those questions to be asked or answered. Furthermore, the parties agree that Porter asked him no health questions. Porter furnished Anglin a copy of

---

[2]This same certificate encompasses Certificate Number 1746755*0*, which is the credit life insurance coverage and Certificate Number 1746755*7*, which is the monthly disability insurance coverage. The combined monthly disability insurance coverage purportedly provided to Anglin via Certificates Number 1746754*7* and 1746755*7* was $867.30. Note, however, that each certificate of insurance specifically states that "[t]he maximum aggregate Total Disability benefit payable to any Insured Debtor under this and all other certificates is . . . $300.00 per month for ages 51-65."

[3]On both applications, Anglin was listed as the "insured debtor" and People's Bank was listed as the "creditor beneficiary."

[4]This provision was contained on the back of the certificate of insurance. Note that each certificate of insurance was on the same document as the application for insurance. For reasons unexplained in the record, Gulf Guaranty claims it did not receive these applications for insurance/certificates of insurance until September 9, 1998.

[5]This was corroborated by Porter.

the certificates of insurance.  Anglin further asserted that Porter told him as he left the office that "you're covered."  Porter denied telling Anglin that he was "covered" or otherwise implying that Anglin's coverage was guaranteed.  By contrast, Porter claimed that he informed Anglin that "[b]ecause the loan amounts were over $10,000 . . . he could probably expect a . . . health questionnaire [from] Gulf Guaranty."

¶4.     On August 25, 1998, Anglin borrowed an additional $60,000.00 for the purpose of buying an excavating machine.  Anglin purchased credit life and monthly disability insurance.  The certificate of insurance pertaining to the August 25, 1998, loan purported on its face to provide $80,010.64 in credit life insurance coverage and $1,666.89 in monthly disability insurance coverage (Certificate Number 1746759).[6]  The certificate of insurance stated that "[Gulf Guaranty] agrees to insure the Insured Debtor(s) as specified in this Certificate, subject to the provisions contained in the Group Credit Insurance policy."  For reasons unexplained in the record, Gulf Guaranty claims it did not receive this certificate of insurance until October 14, 1998.  After receipt, and prior to cancelling, Methvin testified that Gulf Guaranty reduced the credit life insurance coverage to $64,311.00 "because it was so much over the maximum allowed for [Anglin's] age . . . ."  This testimony is contrary to the policy language, which stated in a limitation provision that for insureds between the age of 50-61, "[t]he aggregate amount of life insurance . . . under this and all other [c]ertificates shall not exceed" $50,000.00.  Accordingly, this coverage which Anglin purchased was of

_____

[6]The monthly disability insurance coverage of Certificate Number 1746759 was of no value.  *See* footnote 2 *supra*.

4

limited value, although the premium was based on stated coverage, since he already held certificates of insurance totaling in excess of $36,000.00 of credit life insurance coverage.

¶5. On October 20, 1998, both credit life insurance coverage and monthly disability insurance coverage were cancelled on Certificate Number 1746759 and the premiums were returned to the bank. However, this suit involves only the two July 31, 1998, certificates of insurance.

¶6. On September 14, 1998, Anglin was admitted to Baptist Memorial Hospital complaining of muscle weakness. The office notes of The Neurology Clinic from that same day indicate that "[Anglin] has probable diagnosis of [ALS]."[7] By October 6, 1998, the outpatient record of Anglin at North Mississippi Medical Center definitively diagnosed Anglin as suffering from "ALS with increasing shoulder and arm pain."

¶7. Regarding Certificate Number 17467557, on October 16, 1998, Gulf Guaranty sent a letter to People's Bank, with a copy to Anglin, stating that "[w]e must regretfully inform you that our company *will not be able to accept the disability coverage* under the above mentioned certificate for the following reason shown. INFORMATION SUBMITTED ON HEALTH QUESTIONNAIRE.[8] We are enclosing our check covering the full disability premium received." (Emphasis added). Subsequently, on October 20, 1998, Gulf Guaranty sent three letters to People's Bank related to Certificates Number 17467540, 17467550, and

_____

[7]In deposition testimony, Anglin claimed he first learned that he had ALS on September 14, 1998. He further asserted that when he was offered and applied for insurance from Gulf Guaranty, he did not know that he had ALS. Gulf Guaranty has *not* raised misrepresentation or preexisting condition as an issue in this appeal.

[8]According to Anglin's deposition testimony, he received a health questionnaire in September.

17467590, with copies to Anglin, each of which stated "[c]redit [i]nsurance for this insured has been *cancelled* as of the original date of the loan and full refund of all premium paid for this coverage is being returned." (Emphasis added). There is no evidence in the record that the monthly disability insurance coverage on the first certificate of insurance was declined or cancelled.

¶8.     Methvin was responsible for underwriting "all of the credit life, disability and some of the Gulf [Guaranty] term coverages." She testified that Gulf Guaranty has no written operating procedures on underwriting the credit life or monthly disability insurance coverage.[9] Gulf Guaranty bases its underwriting decisions on her personal knowledge, skill, and the information provided in the application process. As to Anglin, she decided to cancel credit life insurance coverage after examining his medical records.

¶9.     Methvin initially distinguished the term "decline" from "cancel," stating that "[d]eclined is when we inform the insured that we cannot accept his coverage."[10] She could not explain why the October 16, 1998, letter stated that monthly disability insurance coverage on Certificate Number 17467557 was "not . . . able to [be] accept[ed,]" while the October 20, 1998, letters provided that the credit life insurance coverage on Certificates 17467540, 17467550, and 17467590 were "cancelled."[11] Furthermore, Methvin testified that the credit

_____

[9]She follows no standard references, medical regulations, or industry guidelines in making underwriting decisions on acceptable or unacceptable risks.

[10]Later, however, she insisted that "[t]here's not a difference" between declining and cancelling coverage.

[11]Specifically:

Q.     Can you tell me what, if any, reason there would be one letter which

6

life insurance coverage on Certificate Number 1746754*0*, in the amount of $15,051.72, had been reinsured by Gulf Guaranty.

¶10.    At the time he received these letters, Anglin testified that he "was fixing to file a claim on them[,]" but had not yet filed any claims. Following "cancellation," Porter testified that People's Bank "receive[d] the premium back and credit[ed] them to the balance of the loan."

¶11.    On June 9, 1999, Anglin filed his complaint against Gulf Guaranty claiming that:

> 26. Gulf Guaranty breached the contracts between it and Anglin. . . .
> 29. Alternatively, the actions of Gulf Guaranty, by and through its agent, created a justifiable reliance on the part of Anglin requiring reinstatement of the contracts at question.[12]

In its answer, Gulf Guaranty responded that:

> [p]ursuant to the application submitted to [Anglin], Gulf Guaranty had ninety (90) days from the date of the loan to *decline* to insure [Anglin] if Gulf Guaranty found him not to be an insurable risk. Within ninety (90) days from the date of the loans Gulf Guaranty determined that [Anglin] was not [an] insurable risk and properly *declined* to insure [Anglin]. . . . Because Gulf Guaranty properly exercised its right to *decline* to insure [Anglin], no contract existed after the date Gulf Guaranty exercised its right.

(Emphasis added). On May 13, 2000, Anglin died of ALS.[13]

---

states the company cannot accept coverage and the other letters cancel[ling] coverage.

A.    No.

[12]Additionally, Anglin maintained that "[i]n reliance upon the issuance of these certificates of insurance, [he] forewent the opportunity to obtain alternate insurance coverage."

[13]Thereafter, Paula Anglin was appointed as administrator of his estate and by order of the Chancery Court of Lee County, Mississippi was "substituted as . . . Plaintiff." We refer to both Anglin and Anglin's estate as "Anglin."

7

¶12. By September 13, 2005, when Gulf Guaranty filed its motion for summary judgment, it asserted that "cancelled" and "declined" were synonymous terms and declared "[a]ll of [the] coverage for credit life and disability insurance was *cancelled and/or declined* within ninety (90) days of the dates of the loans in question per the terms of the [c]ertificates in question." (Emphasis added). Therefore, Gulf Guaranty maintained that "[it] is entitled to summary judgment as a matter of law." In response, Anglin asserted that Gulf Guaranty "only reserved the right to '*decline*' coverage, *not* to *cancel* coverage." (Emphasis added). On September 22, 2005, the Circuit Court of Lee County heard Gulf Guaranty's motion for summary judgment. At the hearing, Gulf Guaranty notably stated:

> [t]here was *no claim* that was presented prior to their decision not to accept the risk. If there had been, we would be here talking about an entirely different case. . . . They probably would have just paid him, because every insurance company is familiar with the fact that *post-claim underwriting* is *prohibited*, *but* the Supreme Court has *never* said that *pre-claim underwriting* is prohibited.

(Emphasis added). Following the hearing, the Circuit Court of Lee County entered its order dismissing Anglin with prejudice, finding that "there is no genuine issue of material fact with regard to the claims presented in the [c]omplaint, and . . . [Gulf Guaranty] is entitled to judgment as a matter of law." On November 3, 2005, Anglin filed notice of appeal.

## ISSUES

¶13. This Court will consider:

8

(1) Whether the trial court erred in granting summary judgment for Gulf Guaranty because it "cancelled" rather than "declined" Anglin's credit life insurance coverage.[14]

(2) Whether Mississippi law prohibited Gulf Guaranty from cancelling credit life insurance coverage on the ground that Anglin was uninsurable, where it initially issued the coverage without asking health questions.

(3) Whether Mississippi law estops Gulf Guaranty from cancelling credit life insurance coverage after the onset of a disabling and fatal illness.

## STANDARD OF REVIEW

¶14.   This Court:

> employs a de novo standard in reviewing a trial court's grant of summary judgment. *O'Neal Steel, Inc v. Millette*, 797 So. 2d 869, 872 (Miss. 2001). In conducting the de novo review, this Court looks at all evidentiary matters, including admissions in pleadings, answers to interrogatories, depositions, and affidavits. *Lee v. Golden Triangle Planning & Dev. Dist., Inc.*, 797 So. 2d 845, 847 (Miss. 2001).  This evidence must be viewed in the light most favorable to the party against whom the motion for summary judgment has been made. [Citations omitted].

*Noxubee County School Dist. v. United National Ins. Co.*, 883 So. 2d 1159, 1163 (Miss. 2004).  "If any triable issues of fact exist, the trial court's decision to grant summary judgment will be reversed.  Otherwise the decision is affirmed." *Price v. Purdue Pharma Co.*, 920 So. 2d 479, 484 (Miss. 2006).  *See also* Miss. R. Civ. P. 56(c).

---

[14]Stated otherwise, will this Court grant an insurance company greater rights than those it reserved for itself in the contract?

9

**I. Whether the trial court erred in granting summary judgment for Gulf Guaranty because it "cancelled" rather than "declined" Anglin's credit life insurance coverage**.

¶15. "The interpretation of an insurance policy is a question of law, not one of fact." *United National*, 883 So. 2d at 1165. Questions of law are reviewed de novo by this Court. *See Spears v. State*, 942 So. 2d 772 (Miss. 2006).

¶16. "Insurance policies are contracts, and as such, they are to be enforced according to their provisions. . . . When parties to a contract make mutual promises (barring some defense or condition which excuses performance), they are entitled to the benefit of their bargain." *United National*, 883 So. 2d at 1166. This Court has stated that:

> [g]enerally, under Mississippi law, when the words of an insurance policy are plain and unambiguous, the court will afford them their plain, ordinary meaning and will apply them as written. *Paul Revere Life Ins. Co. v. Prince*, 375 So. 2d 417, 418 (Miss. 1979). Under Mississippi law, ambiguous and unclear policy language must be resolved in favor of the non-drafting party – the insured. *Harrison v. Allstate Ins. Co.*, 662 So. 2d 1092, 1094 (Miss. 1995).[15] Further, provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer. *Nationwide Mut. Ins. Co. v. Garriga*, 636 So. 2d 658, 662 (Miss. 1994).

*United National*, 883 So. 2d at 1165. This Court is "bound to enforce contract language as written and give it its plain and ordinary meaning if it is clear and unambiguous. [Citations omitted]." *Mississippi Farm Bureau Cas. Ins. Co. v. Britt*, 826 So. 2d 1261, 1266 (Miss. 2002).

---

[15]*See also Provident Life and Accident Ins. Co. v. Goel*, 274 F. 3d 984, 991 (5th Cir. 2001) ("Mississippi courts strictly construe any ambiguity in an insurance policy against the insurer.").

¶17. This Court relies upon the express language of the certificates of insurance. In so doing, we shall not accord either party greater or different rights than they agreed upon at the time of contract formation. In the case sub judice, the express language in each certificate of insurance is plain and unambiguous. It explicitly provides that "[i]f [Gulf Guaranty] finds the Insured Debtor is not an insurable risk, it reserves the right to *decline* the Insurance *within* 90 days of the Date of Loan *by mailing notice of declination directly to the Creditor Beneficiary and returning all premiums* collected for this Certificate." (Emphasis added). The controversy here arises because, within ninety days of the date of the loan, Gulf Guaranty mailed notice of *cancellation* directly to People's Bank regarding the credit life insurance coverage and returned all premiums. As cancellation and declination are clearly not synonymous terms, focusing upon the clarity of the contractual provision is a red herring. *See State Farm Mut. Auto Ins. Co. v. Scitzs*, 394 So. 2d 1371, 1372 (Miss. 1981) (this Court will not create ambiguities where they do not exist). Instead, the plain and unambiguous term "decline" must be afforded its "plain, ordinary meaning" and be applied "as written." *United National*, 883 So. 2d at 1165.

¶18. Anglin maintains that the provision at issue merely gave Gulf Guaranty "the right to 'decline' coverage under certain circumstances. It did not give Gulf Guaranty the right to 'cancel' insurance. Nevertheless and contrary to policy terms, Gulf Guaranty cancelled all three credit life insurance policies which it issued to [Anglin,]" but never declined within the ninety day window provided. In reply, Gulf Guaranty asserts that Anglin is elevating form over substance. In its estimation, "[t]o the extent that there is a difference in meaning between the terms 'cancelled' and 'declined,' the focus should center on the substance of

11

Gulf Guaranty's action in terminating the coverage in question."[16] Gulf Guaranty argues that the terms of coverage in the certificates of insurance "reserved the right to pursue underwriting for a period of ninety (90) days. In the interim, coverage was conditionally provided until such time, if any, as it was determined that the insured risk was not acceptable." As such, Gulf Guaranty maintains that "the substance of what Gulf Guaranty did with regard to the July 31, 1998 [c]ertificates was to decline to finalize its conditional acceptance[17] of [Anglin] as an insurable risk."

¶19.    "[W]here the insurance policy does not provide the definition for a term or phrase, those words are afforded their ordinary and popular meaning." *United National*, 883 So. 2d at 1165 (citing *Blackledge v. Omega Ins. Co.*, 740 So. 2d 295, 298 (Miss. 1999)). In determining the ordinary meaning, this Court will often consult leading dictionaries. *See Merrimack Mut. Fire Ins. Co. v. McDill*, 674 So. 2d 4, 8-9 (Miss. 1996); *American Guarantee and Liab. Ins. Co. v. The 1906 Co.*, 273 F. 3d 605, 618-19 (5th Cir. 2001). In so doing, this Court finds that the terms "cancel" and "decline" are distinguishable. To "cancel"

---

[16]Gulf Guaranty alternatively argued that use of the term "declined," as opposed to "cancelled," was a distinction without a difference.

[17]Gulf Guaranty further asserts that its conditional acceptance of Anglin as an insurable risk was permissible under Mississippi law. Without question, conditional acceptance is permissible. *See American Nat. Ins. Co. v. Walters*, 230 Miss. 616, 634, 93 So. 2d 616, 623 (1957). However, the permissibility of conditional acceptance obscures the true issue over which this Court must deliberate, namely, was cancellation of Anglin's credit life insurance coverage equivalent to declination? If there is a distinction between cancellation and declination, discussed *supra*, then a conditional acceptance may only be cancelled, not declined, as only cancellation presupposes an earlier acceptance (conditional or otherwise).

12

means "2. [t]o annul or invalidate." Webster's II New College Dictionary 161 (2001).[18] By contrast, to "decline" means "1. [t]o refuse to do, consider, or accept something." Webster's II New College Dictionary at 293.[19] Clearly, to "cancel" presumes prior validation or acceptance, whereas to "decline" does not. *See Malta Life Ins. Co. v. Washington*, 552 So. 2d 827, 829 (Miss. 1989) ("[i]t should also be noted that the master policy provides not that the Company may *reject* the excess coverage, but that it may *cancel* the excess coverage within thirty days after receipt of notice of the granting of the insurance. The use of the word '*cancel*' clearly contemplates a policy that has *already become effective*.") (emphasis added). While Gulf Guaranty asserts that the distinction elevates form over substance, with respect to this contractual provision, the form and the substance are inextricably connected. As summary judgment was granted for Gulf Guaranty, this Court must view the evidence "in the light most favorable" to Anglin. *United National*, 883 So. 2d at 1163. The plain language of the provision gave Gulf Guaranty the right to "decline" coverage within ninety days of the loan, not accept then "cancel," or accept and reinsure, then "cancel." Gulf Guaranty failed to "decline" credit life insurance coverage within ninety days of each loan.[20] Therefore, this Court concludes that the trial court erred in granting summary judgment for Gulf Guaranty because under the plain and unambiguous language of the certificate of insurance it

---

[18]According to Black's Law Dictionary, to "cancel" means "*2*: [t]o terminate a promise, obligation, or right." Black's Law Dictionary 218 (8th ed. 2004).

[19]According to Black's Law Dictionary, "declination" means "*2*: [a]n act of refusal." Black's Law Dictionary at 439.

[20]Additionally, the record reflects that Gulf Guaranty failed to "decline" monthly disability insurance coverage on Certificate Number 17467547.

improperly sought to "cancel," rather than "decline," Anglin's credit life insurance coverage on Certificates Number 17467540 and 17467550.

¶20.    Moreover, even assuming arguendo that the policy language is ambiguous, such provisions are to "be resolved in favor of the non-drafting party – the insured," *id*. at 1165 (citing ***Harrison***, 662 So. 2d at 1094), and if they "limit or exclude coverage [they] are to be construed liberally in favor of the insured and most strongly against the insurer." ***Id***. (citing ***Garriga***, 636 So. 2d at 662).   The monthly disability insurance coverage on Certificate Number 17467557 was declined by Gulf Guaranty.[21]   The credit life insurance coverage in Certificates 17467540, 17467550, and 17467590, however, were cancelled.  Gulf Guaranty has no explanation for the linguistic form difference in the monthly disability insurance coverage letter and the credit life insurance coverage letter.  Additionally, Gulf Guaranty admits that it reinsured the credit life insurance coverage of Certificate Number 17467540. To "reinsure" means "1. [t]o insure again.  2. To insure by contracting to transfer in whole or in part a risk or contingent liability *already covered* under an existing contract." Webster's II New College Dictionary at 934 (emphasis added).  In order to contract to transfer all or part of Anglin's certificate of insurance, Gulf Guaranty had accepted and then contracted to transfer a portion of the risk to another insurer, thus nullifying its right to decline.  After such an obvious act of acceptance, only cancellation, not declination, would be permissible.  However, Gulf Guaranty, the drafter of the provisions, contractually reserved for itself *only* the right to *decline*.  Therefore, this provision ought to be "construed liberally

---

[21]It stated only that "our company *will not be able to accept* the disability coverage." (Emphasis added).

14

in favor of" Anglin "and most strongly against" Gulf Guaranty. ***United National***, 883 So. 2d at 1165. Gulf Guaranty had only the contractual right to "decline" Anglin's credit life insurance coverage, not "cancel" it. Therefore, even if the policy language is ambiguous, this Court concludes that the trial court erred in granting summary judgment because Gulf Guaranty improperly acted to "cancel," rather than "decline," Anglin's credit life insurance coverage on Certificates Number 1746754*0* and 1746755*0*.

**II. Whether Mississippi law prohibited Gulf Guaranty from cancelling credit life insurance coverage on the ground that Anglin was uninsurable, where it initially issued the coverage without asking health questions.**

¶21.    The July 31, 1998, certificates of insurance (Certificates Number 1746754*0* and 1746755*0*) were issued without any health questions by Porter or the requirement for a health questionnaire. Thus, Anglin argues that Gulf Guaranty "manifested its intent, under Mississippi law, to 'insure the world.' For this reason, Gulf Guaranty could not legally cancel [Anglin's] insurance on the basis of a health condition." *See **Southern United Life Ins. Co. v. Caves***, 481 So. 2d 764, 768 (Miss. 1985) ("[w]here an insurance company makes no effort to establish clear and meaningful guidelines to assist its agents in discerning persons eligible for coverage, but merely relies on the agents' judgment to select those persons appearing to be healthy, that company by its actions manifests an intention to 'insure the world.'").

¶22.    ***Caves***, however, is distinguishable from the case sub judice. There, Caves's loan officer issued him a certificate of insurance for credit life insurance coverage in conjunction with an automobile loan. *See **id***. at 765-66. The certificate of insurance contained a condition that Caves must be in insurable health at the time of issuance and that the insurer

"had 31 days from the receipt of their copy in the home office to investigate and accept or reject the insurance." *Id*. at 766. Twenty-two days after the certificate of insurance was issued, and before the first loan payment was made, Caves died of "a heart attack associated with his pre-existing heart condition." *Id*. After receiving Caves's claim, the insurer postponed payment pending investigation and "[a]fter obtaining medical records and reports of [Caves] . . . rejected the claim, finding that [Caves] was not in insurable health at the issuance of the policy. The company then refunded the . . . premium . . . ." *Id*. Here, however, Anglin had not yet filed any claims before People's Bank's receipt of the cancellation letters from Gulf Guaranty. That fact is significant because even Gulf Guaranty admitted that had there been a claim, "we would be here talking about an entirely different case . . . [Gulf Guaranty] probably would have just paid him . . . ."

¶23. Gulf Guaranty contractually had the right to *decline* the insurance coverage within ninety days regardless of whether health questions were asked by Porter or answered on the application for insurance form. The problem is that Gulf Guaranty asserts that it conditionally accepted Anglin, with the right to *cancel* insurance coverage within ninety days. That assertion is implicit in its statement at the summary judgment hearing that had Anglin filed a claim, the case would be entirely different.[22] However, the plain language of the provision permits Gulf Guaranty only to *decline* insurance coverage. That which is conditionally accepted may not be *declined*, but only *cancelled*, because only cancellation

---

[22]Furthermore, in its memorandum brief in support of the motion for summary judgment, Gulf Guaranty stated, "[Anglin] was 'covered' until the certificates were terminated in October."

16

presupposes an acceptance (conditional or otherwise). Therefore, prior to a claim being filed,[23] an insurer may conditionally accept an insured, reserving the right to *cancel* credit life insurance coverage on the ground that the insured is uninsurable, regardless of whether or not health questions were posed. *See **Gulf Guaranty v. Kelley***, 389 So. 2d 920, 922 (Miss. 1980) (in a suit asserting failure to fulfill an obligation to provide insurance coverage, a recognizable defense is the non-absolute right of the insurance company, under the terms of its policy, to *cancel* the certificate of insurance issued within the number of days specified in the policy for the exercise of such right). Here, however, Gulf Guaranty reserved only the right to *decline*, not *cancel*, coverage. *See* Issue I. *supra*.

### III. Whether Mississippi law estops Gulf Guaranty from cancelling credit life insurance coverage after the onset of a disabling and fatal illness.

¶24. Anglin asserts that "Gulf Guaranty's cancellation of [Anglin's] policy after the onset of his fatal illness was unconscionable. Clearly, a person diagnosed with the fatal Lou Gehrig's disease could not obtain insurance from any other source much less any other reputable source." In support thereof, he cites ***Kelley***, 389 So. 2d at 920. In that case, Kelley was issued a certificate for credit life insurance coverage in connection with an automobile loan on June 28, 1975. *See **id***. at 921. The certificate of insurance provided that the terms of the *unattached* master policy applied. *See **id***. The master policy provided that:

> [t]he company may, within ninety (90) days from date of issue of a certificate
> to a borrower . . . *cancel* the insurance on the life of such borrower five (5)
> days after written notice has been mailed to the creditor together with the

---

[23]Except in situations where the proof of claim or proof of loss requirement has been waived. *See **New Hampshire Ins. Co. v. Robertson***, 352 So. 2d 1307, 1311 (Miss. 1977); ***Soso Trucking Inc. v. Central Ins. Agency***, 236 So. 2d 398, 401-02 (Miss. 1970).

17

company's check for the unearned portion of the premium actually paid therefor.

*Id*. (emphasis added). On June 24, 1975, Kelley had been examined by his personal physician and deemed in good health. *See id*. On July 1, 1975, Kelley suffered a heart attack. *See id*. When Gulf Guaranty learned of the heart attack on July 18, 1975, it "cancelled the policy[,] . . . notified the bank which was the named beneficiary by mail, and refunded the unearned premium." *Id*. Kelley died on July 24, 1975. *See id*. Based upon that set of facts, this Court stated:

> Defendant argues it had the *absolute right* under the terms of its master policy to cancel the certificate of insurance issued to Kelley within 90 days from the date of issue. *Ordinarily, this defense would be upheld; however*, in this case the onset of Kelley's fatal illness occurred after the policy was in effect and continued without remission until his death. Considerations of public policy persuade us that, exercise by the insurer of its right to cancel should not be permitted after the onset of a fatal illness and death therefrom, upon the ground of estoppel. . . .
>
> . . . Allowing defendant to cancel the policy after Kelley became uninsurable would be unconscionable because Kelley had then reached such a physical condition that he was unable to obtain desirable insurance in any reputable company before his death.

*Id*. at 922 (emphasis added).

¶25.    In response, Gulf Guaranty initially argues that "[e]ven if [Anglin's] argument in this regard had merit, which it does not, [Anglin] did not plead estoppel or public policy in his Complaint. Neither did [Anglin] argue this theory in the court below." Even assuming that the argument is not procedurally barred, however, Gulf Guaranty insists that "the conditional nature of the insurance coverage was clearly communicated on the [c]ertificate of [i]nsurance itself, knowledge of which is imputed to the insured."

18

¶26.    This Court has "been consistent in holding that we need not consider matters raised for the first time on appeal, which practice would have the practical effect of depriving the trial court of the opportunity to first rule on the issue, so that we can then review such trial court ruling under the appropriate standard of review." *Alexander v. Daniel*, 904 So. 2d 172, 183 (Miss. 2005).  For this reason, this Court concludes that consideration of this issue on appeal is procedurally barred.  However, since this case is being remanded for trial, the procedural bar for purposes of consideration on appeal is not a prohibition upon the parties to litigate this issue.

## CONCLUSION

¶27.    Based upon the aforementioned analysis, this Court finds that the Circuit Court of Lee County erred in granting summary judgment for Gulf Guaranty.  Therefore, this Court reverses and remands to the circuit court for proceedings consistent with this opinion.

¶28.    **REVERSED AND REMANDED**.

   **SMITH, C.J., WALLER, P.J., DIAZ, EASLEY, CARLSON, GRAVES AND DICKINSON, JJ., CONCUR.  COBB, P.J., NOT PARTICIPATING.**